[621 NYS2d 582]

In the Matter of C. VERNON MASON (Admitted as CECIL VERNON MASON), an Attorney, Respondent. DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT, Petitioner.

First Department, January 26, 1995

### APPEARANCES OF COUNSEL

*Richard M. Maltz* of counsel *(Hal R. Lieberman,* attorney), for petitioner.

*Howard Benjamin* for respondent.

### OPINION OF THE COURT

Per Curiam.

Respondent, C. Vernon Mason, was admitted to the practice of law in New York by the First Judicial Department on January 15, 1973 under the name Cecil Vernon Mason. At all times pertinent to this proceeding respondent has maintained an office for the practice of law within the First Judicial Department.

On or about October 21, 1992 respondent was served with a Notice and Statement of Third Amended Charges dated October 21, 1992.[1] The charges alleged, *inter alia,* a pattern of neglect, dishonesty, fee gouging and abandonment of clients, encompassing a six-year period beginning in 1986, and involving 21 separate clients. The charges included 74 separate counts alleging violations of the following provisions of the

---

1. The original charges were filed in about March 1991 and the hearing commenced on December 19, 1991. The Third Amended Charges and the Fourth Amended Verified Answer were served in the course of the hearing and, by agreement, became, respectively, the final accusatory instrument and response thereto.

Lawyer's Code of Professional Responsibility: DR 1-102 (A) (4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation—five counts), (5) (engaging in conduct that is prejudicial to the administration of justice—five counts) and (6) (now [8]) (engaging in conduct that adversely reflects on the lawyer's fitness to practice law—21 counts); DR 2-110 (improperly withdrawing from a case—seven counts); DR 3-101 (aiding a nonlawyer in the unauthorized practice of law—six counts); DR 6-101 (A) (handling a legal matter incompetently, handling a legal matter without adequate preparation and neglecting a legal matter—17 counts); DR 7-101 (A) (failing to seek the lawful objectives of a client, failing to carry out a contract of employment entered into with a client and prejudicing or damaging the client during the course of the professional relationship—11 counts); and DR 9-102 (A) and (B) (commingling client funds with personal funds and failing to establish separate accounts for clients funds—two counts).

On or about January 25, 1993 respondent served a Fourth Amended Verified Answer denying many of the factual allegations in the charges and denying that he had engaged in professional misconduct.

A Hearing Panel convened and held hearings over 52 separate sessions beginning on December 19, 1991 and finishing on April 6, 1994. The transcript exceeds 8,000 pages with 680 or more exhibits. Presentation of the evidence on the merits was completed on June 17, 1993. The Hearing Panel considered 71 of the 74 charges of professional misconduct. Staff counsel to the Departmental Disciplinary Committee (DDC) had withdrawn three of the charges (Charges 60, 61 and 62). After posthearing submissions, closing arguments were held on December 7, 1993 and a hearing on sanction was held on April 6, 1994. We take note of the fact that although respondent was present and testified during the "merits" phase, he chose not to appear for the sanction hearing. The salient facts adduced and conclusions reached during the course of the hearings are as follows:

Charges 1 through 6 involve a complainant who sought out respondent to represent her son on his appeal from convictions for murder and criminal possession of a weapon and to assist her in obtaining the return of $15,000 in bail money which she had posted for her son. The complainant stated that all but $2,000 of the sum posted had been borrowed and had to be repaid. The respondent and the complainant met on July 5, 1989 and the complainant was told that her son had a good

case, that respondent could get the conviction reversed and that he would quickly obtain a refund of the bail money. Respondent stated that his fee for the appeal would be $25,000. The complainant stated that she could not afford this sum as her only sources of income were a pension from Chase Manhattan Bank, where she had been a computer operator, and $200 a week from the Mount Sinai Baptist Church were she worked part time.

The complainant testified that she was led to believe that respondent would accommodate his fee in recognition of her financial condition and initially paid respondent a $3,000 retainer on account. She was given a receipt which indicated that the $22,000 balance was to be paid in installments, but which did not define the amount or frequency of those installments. As was respondent's uniform practice, no written retainer agreement was submitted to the client and no internal record was maintained by his office to reflect the terms of the oral retainer. According to the complainant, there was no mention that any portion of respondent's fee would be paid from the bail proceeds. However, at respondent's request, the complainant executed an assignment of the bail money to respondent in reliance upon respondent's assurance that the assignment would help him process his application for the return of the bail money.

The respondent and the complainant presented conflicting accounts as to the nature and extent of their discussions concerning respondent's fee and whether or not all or part of the $15,000 bail money would be applied toward payment thereof. In essence, respondent stated that the complainant on various occasions agreed to commit different portions of the bail money to his fee. The complainant denied this and maintained that she could not use any portion of the bail money to pay the respondent as she had to repay those she borrowed the money from.

The record shows clearly however that, shortly after the July 5th meeting, this complainant received a bill from respondent, dated July 11, 1989, which provided that she was to pay the balance of respondent's fee in four monthly installments of $4,125 each (i.e., $16,500), with the remaining $5,500 to be paid to respondent from the bail refund. The complainant asserted that this proposed arrangement had never been discussed with her and that no agreement was ever reached with respect to either the disposition of the bail money or to how the balance of respondent's $25,000 fee would be paid.

Respondent claimed on July 24, 1989, the complainant allegedly advised him that she would be unable to obtain the money to pay the remainder of his fee and that she wanted to assign the bail in connection with the portion of legal fees due and owing.

Respondent obtained a refund of the bail money ($15,000 less a $300 administration fee) on or about September 18, 1989 and concededly deposited the entire sum into a nonescrow business account. Respondent claimed that at the time he deposited the bail money in his business account, he believed that the complainant had agreed to apply the entire amount of the bail refund to his fee. However, he alternatively asserted that he believed that only a portion of the bail money, to wit, $7,500 was to be applied to the retainer agreement. The record shows that respondent failed to advise the complainant that he had obtained the bail refund and, that the complainant learned of the refund from the City, at which point, she confronted respondent and requested payment of the entire amount of the bail proceeds. On October 4, 1989, respondent wrote complainant to the effect that he would return $7,500 of the $14,700 bail money, and would apply the balance (i.e., $7,200), together with the $3,000 paid by her on July 5, towards his retainer. The respondent did not return the $7,500 until November 7, 1989, after a complaint against respondent with the Disciplinary Committee had been filed by this complainant. Respondent attempted to explain this delay by asserting that he was not discharged by the complainant's son until October 30, 1989 and further claimed that the $10,200 which he retained had been earned by him as legal fees.

The evidence presented to the Hearing Penal shows that from the time of his retention on July 5, 1989 until the time of his discharge respondent met with the client twice, prepared and filed a notice of appeal, and made two court appearances. On the first, respondent only obtained an adjournment of the client's sentencing date. The second appearance was at the July 20, 1989 sentencing hearing at which respondent stood by while the complainant's son read into the record a motion for a new trial prepared not by the respondent, but by the complainant's son. Respondent then made a brief nonsubstantive statement on the son's behalf, during which he assured the court that he would be filing a postconviction motion and that he would handle the appeal.

In a letter to the complainant's son dated November 14,

1989, respondent acknowledged that he had not proceeded with the appeal because he had not been "fully retained"—a phrase used by respondent to mean that the client had not paid the entire amount due and that, in respondent's view, he was not yet obligated to render services. Respondent also testified that the promised motion to set aside the verdict was never made or drafted, because respondent had not yet obtained the trial transcript.

As a result of respondent's actions, he was charged with commingling his funds with the funds of a client (Charge 1); applying, without authority, his client's funds in payment of his legal fees (Charge 2); failing to return his client's funds when requested (Charge 3); engaging in conduct involving dishonesty, fraud, deceit or misrepresentation when he took a fee in excess of that previously agreed upon, without the client's consent (Charge 4); failing to refund the unearned portion of his fee (Charge 5); and engaging in conduct which adversely reflected on his fitness to practice law (Charge 6). Based upon the evidence presented the Hearing Panel sustained Charges 1, 2, 3, 5 and 6, but dismissed Charge 4.

Charges 7 through 9 involve a defendant who was sentenced to jail as a convicted felon on September 19, 1993. His trial counsel promptly filed a notice of appeal. Respondent was retained by the defendant's parents, in November 1983, to prosecute the appeal. Almost six years later, on September 20, 1989, after the defendant had been paroled in January 1989, respondent finally perfected the appeal. The conviction was ultimately affirmed.

Respondent conceded that by April 1984 he had obtained prior counsel's file and had reviewed and analyzed the trial transcript. Respondent then obtained two extensions of time to file his brief, the second of which directed that the brief be filed by November 1, 1984. Respondent did not meet that deadline. After almost two full years of inactivity, respondent finally moved, in November 1986, for a further extension and sought "limited" in forma pauperis relief, relying in part on a conclusory affidavit of indigency from his client, which had been sworn to on June 16, 1986. It was respondent's position, based upon his many years of criminal appellate work, that the Court will not look at an in forma pauperis petition in a positive manner if that petition is made at the beginning of a case where the defendant has retained counsel. Respondent also blamed his delay on office turnover and the press of other business: in 1985 he was running for Manhattan District

Attorney; in 1986 he was involved in the Howard Beach episode; and in 1987 he was involved in the Tawana Brawley matter.

In his moving papers in support of the petition for poor person relief, respondent affirmed that his brief had been completed. Thus, all that remained for him to do, in December 1986, to process the appeal was to reproduce the brief and supply the record to the Court. The Court issued its order on January 6, 1987, allowing respondent to proceed on the original record and mandating that his brief and the record on appeal be filed for the Court's April 1987 Term. Respondent, however, waited until December 1987, over nine months beyond the Court-imposed deadline, to send the brief to the printer. The printer testified that the Court then refused to accept that brief for filing because the record had not been filed, and that notice of this omission had been promptly provided to respondent's employee, a law school graduate who had passed the Bar but who was never admitted to practice. Respondent had assigned this case to this individual and claimed that the primary cause of the neglect may have been the inactivity of this employee. Respondent thereafter admitted that the ultimate responsibility was his alone but denied knowledge of any notification by the Court that the brief was rejected for filing. However, the record reflects that respondent never followed up to insure that the appeal was perfected. Moreover, he failed to focus on the failure of the prosecutor either to file an opposing brief or to seek an extension of time to do so, which would have signaled to respondent that something was wrong. Upon being informed that the brief had not been accepted, respondent took steps to file the necessary transcripts and completed that process by June 1989.

As a result of respondent's actions he was charged with neglect (Charge 7); failing to carry out a contract of employment (Charge 8); and engaging in conduct adversely reflecting on his fitness to practice law (Charge 9). Based upon the evidence presented the Hearing Panel sustained all three charges.

Charges 10 through 14 involve respondent's retention by a college freshman, who was assaulted and injured while watching a basketball game at The College of Staten Island. She and her father retained respondent on February 24, 1987.

On March 30, 1987, respondent timely sent a notice of claim

to The College of Staten Island, the Corporation Counsel and the Board of Trustees of the City University of New York. In June 1987, the New York City Comptroller advised respondent that he should have served the Board of Higher Education, not the City of New York. Respondent had also failed to recognize that, pursuant to Education Law § 6224 (4), the Court of Claims is vested with exclusive jurisdiction over tort claims involving senior colleges of the City University. By this time, the 90-day period within which to file such a claim had expired. Respondent testified that he had requested an associate in his office to make a motion for leave to effect a late filing. However, no such motion was made until December 31, 1987, nine months after the notice of claim should have been filed. Respondent's motion papers were defective as they failed to include an affidavit of service and, for this reason, his motion was denied. The motion was resubmitted with proper proof of service but, on March 17, 1988, it was again denied (with leave to renew de novo). Respondent's papers had not addressed the factors set forth in Court of Claims Act § 10, which must be considered by the court in connection with any application for leave to file a late claim. Counsel for the City University had previously advised respondent that section 10 would govern his application. Furthermore, in its opposing papers the City of New York had suggested that respondent proceed against the company which was in charge of providing security at the college. At the time respondent received this advice, the Statute of Limitations had not expired against the potential defendant. Respondent chose to ignore this advice without discussing it with his client.

Respondent did not receive a copy of the court's decision on his motion for leave to file a late notice of claim until October 1988, about seven months after it was rendered. While respondent contended that the court failed to send him a copy of the decision—it did send such copy to the Attorney-General but apparently not to the attorneys for the other defendants, and the Attorney-General's office never served copies with notice of entry—respondent offered no explanation for his failure to make any effort to determine whether or not the decision had actually been rendered during those intervening seven months.

Respondent attributed the many lapses in this case to the fact that neither he nor the associates he assigned to the matter, had much experience with litigating in the Court of

Claims. In addition, respondent stated that the two associates involved had simply failed to carry out the tasks assigned.

On March 31, 1989, the complainant wrote to respondent and requested information as to the status of her case and stated that if she did not receive meaningful information by April 17, she would take other action. On May 19, 1989, respondent met with the complainant and told her that a renewal motion with respect to the denial of the application for leave to file a late notice of claim had not been made. According to respondent the complainant stated that she had contracted other lawyers and would be making her own arrangements for the further prosecution of the case. The complainant denied this, asserting that respondent had given her the clear impression that he would continue representing her in this lawsuit.

While respondent testified before the Panel that he was discharged during that meeting, in his initial answer to this complaint respondent asserted, in accordance with the complainant's statement, that he had advised the complainant that he would proceed with the case.

As a result of respondent's actions, he was charged with neglect (Charge 10); intentionally failing to seek the lawful objectives of a client (Charge 11); improperly withdrawing from employment (Charge 12); handling a legal matter which he knew or should have known he was incompetent to handle, or handling such a matter without adequate preparation (Charge 13); and engaging in conduct which adversely reflected on his fitness to practice law (Charge 14). Based upon the evidence presented the Hearing Panel dismissed Charge 12, but sustained the remaining charges.

Charges 15 through 16A involve respondent's retention on January 19, 1985 to handle a defendant's appeal from a conviction of manslaughter in the first degree. At the time respondent was paid $1,900 against his $3,500 fee. He was told that the defendant had prior counsel, but never informed that counsel or the District Attorney's office of the substitution. Respondent failed to file a notice of appearance with the court and he did not seek an order of substitution. Six months later, in July 1985, respondent made a single unsuccessful attempt to obtain the trial minutes from the Legal Aid Society. However, said minutes were no longer in its possession, apparently having been delivered to the defendant's court-appointed 18-B counsel. Respondent made no follow-up inquiries to obtain

these minutes and consequently never prepared an appellate brief. During this same period of time, respondent was seeking to collect the balance of his retainer.

In March 1986, the 18-B lawyer filed an appellate brief on behalf of the defendant. When respondent learned of this, he wrote to the defendant, apologized for his delay in prosecuting the appeal (which was blamed on respondent's political endeavors and staff turnover) and inquired which attorney was going to handle the appeal. Respondent also stated that he intended to review that brief to see whether it would be advisable to withdraw it, but promised to do nothing without further consultation with the defendant. Then, without making any determination regarding the merits of the brief, which had already been filed with the Court, respondent sought to obtain an order compelling the withdrawal of that brief and giving respondent additional time to file his own appellant's brief. At the time, respondent was still not the attorney of record for the defendant and was not authorized to make the motion. However, the defendant did send a letter to respondent's office on April 2, 1986 notifying respondent that he was unaware of any court-appointed lawyer and reassured respondent that he was still his legal counsel.

With respect to the abovesaid motion, the record shows that respondent's notice of motion was dated April 24, 1986 and it was returnable on the following day, April 25, 1986—the same day for which the appeal was scheduled for argument. Respondent did not seek an appropriate stay of that argument, no copy of respondent's motion papers was served on the 18-B attorney (whose brief was the subject of the motion) and only the District Attorney's office was served. Respondent reported to the DDC and to his client that this motion was denied. The Court files, however, contain no record of the receipt of any such motion. Respondent conceded that no opposing papers had ever been received.

The defendant's wife did submit, for the Panel's information, an original set of such motion papers bearing a "Received" stamp from the Appellate Division inexplicably dated October 29, 1986—six months after the motion's return date—and an admission of service by the District Attorney's office.

After the complaint was filed against respondent with the Disciplinary Committee, he returned $600 of the initial retainer, keeping $1,300.

As a result of respondent's actions he was charged with

improperly retaining the unearned portion of a retainer (Charge 15); engaging in conduct which involved fraud, misrepresentation or dishonesty (Charge 16); and engaging in conduct adversely reflecting on his fitness to practice law (Charge 16A).

Based upon the evidence presented the Hearing Panel sustained each of these charges. With respect to respondent's failure to return the unearned portion of the retainer, the Panel stated that respondent did not perform any significant legal services for this client throughout the entire period of his "representation". The Panel concluded, *inter alia,* that respondent never met with the defendant, that the Appellate Division affirmed the conviction on the papers submitted by the 18-B lawyer and that the respondent never participated in the appellate process on his client's behalf.

Charges 17 through 19 relate to the respondent's retention by a Transit Authority police officer who was fired on February 3, 1986, allegedly for cause. In April 1987, during the course of an administrative review respondent replaced the officer's prior attorney and received an initial fee of $3,000. The officer selected respondent to represent him for a fee despite the fact that his union would have supplied legal counsel to him at no cost. Thereafter, on or about September 24, 1987, the propriety of the Transit Authority's discharge of the officer was upheld. Respondent received a copy of that decision approximately one week later.

Previously in April 1986, respondent's predecessor had commenced a CPLR article 78 proceeding challenging the discharge. In October, the court had referred the matter back to the Transit Authority for an additional administrative hearing pursuant to *Matter of Fogel v Board of Educ.* (48 AD2d 925) and denied the balance of the motion without prejudice to the officer's right to renew after those hearings were concluded. On September 24, 1987, the Transit Authority, after complying with *Fogel,* upheld its original determination.

On April 19, 1988, more than six months after respondent had received the results of that *Fogel* hearing, in which respondent did not participate, respondent made a motion for an order renewing the April 22, 1986 article 78 proceeding. This motion was untimely since four months had expired since the determination to be reviewed became final. Accordingly, in mid-October 1988, the petition was dismissed with prejudice.

Respondent contended that the four-month limitation period was inapplicable since in resolving the article 78 proceeding in 1986, the court had retained jurisdiction of the matter and explicitly invited the renewal motion. However, respondent's motion sought to set aside a determination of the Transit Authority which postdated the court's prior decision, and thus was not a "renewal" motion.

On July 5, 1989 (more than eight months after the second petition was dismissed), the officer, believing that nothing had been done on his behalf, brought a *pro se* action against respondent, alleging neglect and seeking, among other relief, the return of his $3,000 retainer. In early 1990, as part of discussions held in connection with that lawsuit respondent for the first time disclosed to the officer that the second article 78 proceeding had been dismissed. Rather than advising his client that the dismissal was on Statute of Limitations grounds, respondent chose instead to state erroneously that the dismissal had been on the merits. Respondent conceded that he never gave his client a copy of the decision and did not discuss with him the feasibility of an appeal from the dismissal order.

While the respondent stated that he had not spoken with the officer until after the DDC complaint had been filed, the officer testified that he withdrew his action for return of the retainer when respondent promised him that he would commence a class action on his behalf which would "make him rich". Respondent never instituted such an action but on December 19, 1991, nine months after being served with the Notice of Charges in this proceeding, respondent did commence a Federal civil rights lawsuit on behalf of the officer individually.

In a January 2, 1990 affidavit which respondent submitted in opposition to the officer's lawsuit against him for return of his fee payment, respondent attested falsely that he had not been retained by the officer until after the four-month Statute of Limitations had run. At the hearing, respondent attempted to rationalize this misrepresentation by claiming that the affidavit had been erroneously prepared by a young associate in his office, and that respondent had not read the affidavit before swearing to its contents.

As a result of respondent's actions he was charged with neglect (Charge 17); engaging in conduct involving dishonesty, fraud, deceit or misrepresentation (Charge 18); and engaging

in conduct adversely reflecting on his fitness to practice law (Charge 19). The Hearing Panel sustained all three charges.

Charges 20 through 22 involve the respondent's representation of a criminal defendant on his appeal from a 1985 felony conviction. At the time of respondent's retention on January 28, 1987, the client already had two appellate attorneys: the Legal Aid Society and then a private practitioner. A notice of appeal from the 1985 felony conviction had been timely filed by trial counsel in June 1985. Respondent was paid $2,500 on account of an unspecified fee. On April 23, 1987, replaced counsel sent respondent a $2,000 check—the amount of that attorney's retainer. Thus, respondent had been advanced a total of $4,500 against his fee and received prior counsel's file, including the trial transcript, in late March 1987. He completed his legal research for the anticipated appellate brief by September 1988.

Despite repeated requests by prior counsel, respondent failed to file any consent to substitution or notice of appearance with the Court; nor had he bothered to advise his adversary, the Queens County District Attorney's office, that he was this defendant's new lawyer. Two and a half years after his retention, respondent had still failed to take any steps to process the appeal. Finally, in or about October 19, 1989, he filed an in forma pauperis petition wherein he also requested, for the first time, an extension of his time to perfect the appeal. In these motion papers, respondent represented that he had perfected the appeal except for printing the record.

Respondent attempted to excuse his delay in seeking in forma pauperis relief by asserting that the defendant was not indigent so long as his father was living. The defendant's father died in October 1987 and no excuse was offered for the two-year delay after his death in filing the motion.

The in forma pauperis aspect of the motion was denied in November 1989 because respondent's papers failed to adequately demonstrate his client's indigence. Respondent was given leave to renew the motion on proper papers, including an affidavit from his client. The application for an extension of time to perfect the appeal was not resolved by the Court. In August 1990, approximately three and one-half years after being retained, respondent sought to file his appellate brief. It was rejected since respondent had not obtained Court permission to proceed on the original record. Three months later, in

November 1990 respondent filed another in forma pauperis petition (which did include a proper affidavit of indigency from the client) but this time improperly served it on the Kings County—rather than the Queens County—District Attorney.

On January 25, 1991, respondent's in forma pauperis petition was granted. Although respondent's brief had been completed months earlier, it was not filed with the Court until May 30, 1991—approximately 52 months after his retention. The brief ran 14 pages in length, only seven of which were directed to legal argument. This client's conviction was sustained.

As a result of respondent's actions he was charged with neglect (Charge 20); handling a legal matter incompetently or without proper preparation (Charge 21); and engaging in conduct adversely reflecting on his fitness to practice law (Charge 22).

The Hearing Panel sustained all three charges.

Charges 23 through 26 involve respondent's representation of a client on a claim that he had been improperly denied placement on a civil service eligibility list for promotion to train operator with the New York City Transit Authority. In or about February 1986, respondent commenced an article 78 proceeding on behalf of his client but, in June of 1986, the case was marked off the calendar, on consent, until exhaustion of administrative remedies. The stipulation between counsel provided that the case could be restored to the calendar, by motion, after those administrative remedies had been concluded. However, the court accepted only part of the stipulation and directed respondent to exhaust all administrative remedies. The court ruled also that any further proceeding had to be commenced with a new index number and would then be randomly assigned to an IAS Part.

The client had originally been denied placement on the promotion list because of medical problems. On August 6, 1986, as a result of a second medical examination the Transit Authority reversed its position since the client had now been found to be medically fit. One month later, on September 9, 1986, respondent requested the Transit Authority to place the client retroactively into a new class of trainees for the position of train operator. Instead, the Transit Authority offered to place the client's name on a special list for that position, containing his name only. On October 14, 1986, before this offer was implemented the client was suspended for 10 days for insubordination in an unrelated matter.

In December 1986, the Transit Authority submitted a proposed stipulation to respondent, pursuant to which, the article 78 petition would be discontinued with prejudice, and the Transit Authority would agree, *inter alia,* to rescind the prior adverse medical determination and to establish a special list bearing only the client's name, and to certify the client on that list for promotion to train operator upon the Transit Authority's completion of his employment processing. This would have obviated the need for any future litigation based upon the original medical determination. Nevertheless, respondent insisted that the stipulation include the Transit Authority's agreement not to consider the client's insubordination and suspension in connection with any future promotional determination.

On several occasions between January 28, 1987 and May 15, 1987, respondent continued to urge this new term. On May 15, counsel for the Transit Authority reiterated that her client would not accept this condition. On June 18, 1987, respondent advised the Transit Authority that neither he nor his client could sign the proposed stipulation since it did not include a commitment to disregard the suspension. On July 14, 1987, the Transit Authority advised respondent that the earlier article 78 petition had been mooted since the Transit Authority had rescinded any adverse medical finding, and it supplied respondent reasoned argument and case law establishing the futility of seeking to litigate further on that issue. Any motion to restore the case to the calendar would be opposed with a motion to dismiss for failure to state a cause of action.

Nevertheless, nine months later, on April 18, 1988, respondent continued to attempt to litigate the matter insofar as to enforce the "stipulation" offered by the Transit Authority but which both respondent and his client had steadfastly refused to sign. The respondent also erroneously represented that the stipulation had been "so ordered" when in fact it remained unexecuted by his client and not "so ordered". Respondent also ignored the prior direction by the court to commence a new proceeding with a different index number.

The City moved to dismiss the petition on grounds of mootness since the Transit Authority had already granted the relief requested in his original article 78 proceeding. The Transit Authority's pleading recited the circumstances surrounding respondent's refusal to sign the stipulation and also sought dismissal of the petition. The court thereafter dis-

missed the motion with prejudice, and *inter alia,* stated that the petitioner's sole remedy for the alleged violations of the stipulation was to commence a new article 78 proceeding.

Respondent failed to advise the client about the dismissal until contacted by the client and then he never adequately explained the reasons for the dismissal. Thereafter, respondent refused to pursue a new article 78 proceeding unless he received a further payment of fees, despite his original agreement with the client that the purpose of his earlier retention was to reinstate the client to the promotion list.

As a result of respondent's actions he was charged with knowingly advancing an unwarranted claim (Charge 23); acting on behalf of a client without adequate preparation (Charge 24); neglect (Charge 25); and engaging in conduct adversely reflecting on his fitness to practice law (Charge 26). The Hearing Panel sustained Charges 23, 24 and 26. The Panel dismissed Charge 25.

Charges 27 through 29 relate to the respondent's representation of a client in 1984 in a Federal age discrimination action. The State Division of Human Rights had previously found no probable cause for the client's alleged claim. The agreed-upon fee was $3,500 plus a one-third contingency; the $3,500 was paid on August 15, 1984. The lawsuit was started in late 1984 in the United States District Court for the Southern District of New York.

On the eve of its scheduled trial, respondent settled the case for $10,000. The client claimed that he twice rejected respondent's recommendation that the case be resolved for that amount and then, weeks later, learned from respondent that his instructions had been ignored and the case settled. Respondent testified that, while the client wanted more, he did authorize the $10,000 settlement both before and after it was accepted by respondent.

A former associate of respondent who had been assigned to the case, advised the Panel that the client had told him that he approved of the $10,000 settlement. According to this associate, it was only later that the client expressed his dissatisfaction. Another former associate testified that months after the fact, he had discussed the settlement with the client who was clearly not happy with it. While the client complained to this second associate about the quality of respondent's representation, he never asserted that respondent had settled the case without authority.

The settlement was consummated on January 20, 1987, and the action was dismissed with leave to any party to apply within 60 days, by letter, for restoration of the case to the calendar.

On February 20, 1987, there was a brief meeting between client and respondent at which the client angrily complained about the settlement. On February 27, 1987 the client wrote protesting the settlement. On March 4, and again on March 12, 1987, respondent wrote to the client advising him that under the terms of the discontinuance stipulation, he could still reject the settlement provided he advised the court of that fact by March 20, 1987. On or about that date, respondent's office advised the District Court that the settlement, which had been "authorized and accepted" by the client, was no longer acceptable to him. The client did nothing until March 28, when he protested the settlement to Judge Stanton. The court refused to vacate the settlement, a determination which was thereafter vacated on appeal by the client's new counsel. The case was ultimately settled for $26,000.

Meanwhile, in September 1986, despite having previously agreed to a fee arrangement in 1984, respondent sent the client a bill for an additional $7,500 without any prior agreement by, or even discussion with, the client.

As a result of respondent's actions he was charged with failing to seek the lawful objectives of a client by settling a discrimination lawsuit contrary to the explicit instructions of his client (Charge 27); engaging in dishonest and deceitful conduct when he unilaterally modified his fee arrangement with his client (Charge 28); and engaging in conduct adversely reflecting on his fitness to practice law (Charge 29). Based upon the evidence presented the Hearing Panel sustained Charges 28 and 29, but dismissed Charge 27.

Charges 30 through 34 stem from respondent's representation of a client in a landlord/tenant proceeding, which was scheduled for trial on October 13, 1987. At the time, an individual was employed by respondent as a recent law school graduate. Respondent knew that he had not yet been admitted to practice law before the courts in the State of New York.

Respondent sent this individual to Housing Court to obtain an adjournment of the nonpayment proceeding since respondent was on trial in another matter. However, respondent knew the case was marked ready for trial and had made no provision for having a qualified attorney try the case if the

application for adjournment was denied. After appearing on the record as counsel this individual was able to obtain a one-day adjournment of the trial—from October 13 to October 14 —based upon an illness in the client's family. That evening he informed respondent of the adjournment and reported that the case would have to be tried on the following day. Respondent nonetheless directed this employee to be the trial attorney, despite knowing he was not yet admitted to practice. According to this individual respondent assured him that nonlawyers could try cases in Housing Court.

Respondent conceded that he had given this direction on the evening of October 13. However, he later testified, inconsistently, that on the evening of October 14, after being told that the trial would continue on October 15, he had instructed this employee to insist on an adjournment. In fact, the employee ended up acting as trial attorney in the matter on both October 14 and 15, 1987. At the conclusion of the two-day trial, the court ruled against respondent's client. Respondent claimed that he believed that the Trial Judge would allow the nonlawyer to try the case because litigants often appear *pro se* in that Part. Respondent further contended that the court was apprised of the employee's status and nonetheless allowed him to proceed as the client's attorney. However, neither the employee nor the client support respondent's assertion that he had been told that the court would permit a nonlawyer to act as a trial advocate despite being unadmitted. The transcript of the Housing Court proceeding reveals that the true status of respondent's employee was never brought to the court's attention.

Furthermore, while respondent testified that he was unavailable for this trial because he was engaged in a criminal trial in Queens County, relevant court records demonstrate that this was not the case. In addition the client claimed that he had not been advised of the employee's nonlawyer status.

As a result of respondent's actions he was charged with aiding a nonlawyer in the unauthorized practice of law (Charge 30); engaging in conduct prejudicial to the administration of justice when he directed a law school graduate in his employ to appear for a client in a substantive landlord/tenant hearing pending in Housing Court (Charge 31); engaging in conduct involving dishonesty, fraud, deceit or misrepresentation when he failed to inform the client he had directed the nonlawyer to represent him in that court proceeding (Charge 32); intentionally prejudicing or damaging his client (Charge

33); and with engaging in conduct adversely reflecting on his fitness to practice law (Charge 34). The Hearing Panel sustained Charges 30, 31, 33 and 34. The Panel dismissed Charge 32 finding that the client was present at a number of the conversations between respondent and the employee and was aware that the employee had not been admitted to the New York Bar.

Charges 35 through 39 involve a long-time client of respondent, who was released on parole on July 5, 1984. In 1986 and again in 1987, he was twice arrested for several criminal offenses—the second coming after this client was again paroled after the first arrest—and, as a result, was twice charged with having violated his successive paroles.

Respondent had personally conducted a preliminary hearing on the first parole violation. A final hearing was scheduled for July 7, 1986, the Administrative Law Judge having previously advised counsel that no adjournments would be granted. An employee, who was not admitted to practice in New York, was assigned to work with respondent on this final hearing. This employee testified that she was directed to bring the files to respondent on the morning of the hearing at Rikers Island. When, after a wait of three or four hours, respondent failed to appear, the employee believed that she had no other alternative but to represent the client at the hearing as his attorney.

Respondent asserted that he never intended for the employee to represent this client at this parole hearing, although he claimed that he believed that parolees could be, and frequently were, represented by nonlawyers at such evidentiary hearings. Respondent stated that he sent the employee to Rikers solely to request an adjournment. Respondent claimed that at the time, there was a pending writ of habeas corpus which, when (and if) granted, would have assured the client's release, and, therefore, there was no need to have a parole hearing.

A review of the transcript of this final hearing indicates that respondent's employee never mentioned the existence of the writ when she appeared before the Administrative Law Judge and apparently never knew of the existence of the writ despite the fact that she was the only "professional" in respondent's office, other than respondent himself, working on the matter.

Further, any adjournment sought on the client's behalf no matter what its motivation, would have prejudiced his right to

a release as the matter had been marked "final", and under the circumstances, if the Division of Parole were not ready to proceed, the client would have been released from custody. On the other hand, any adjournment attributable to the parolee would have allowed the Division of Parole to avoid the consequences of not being ready for trial. When it was announced that the client was in fact ready to proceed, the Division of Parole was forced to acknowledge that it was not prepared for trial, thereby triggering the client's release.

The next aspect of the charges relates to a second parole violation, resulting from this client's arrest after his previously discussed release. Again at respondent's direction, the same employee appeared and conducted the preliminary hearing on behalf of the client on April 13, 1987.

Respondent initially asserted that this employee was only instructed to advise the court that respondent—who had not yet filed a notice of appearance for the second parole violation —was not representing the client for that purpose. On cross-examination however, respondent claimed that he was not able to recall why he sent a nonlawyer to the preliminary hearing. Respondent further claimed that he was never officially retained in connection with the second parole violation. However, both the employee involved and the client disputed that assertion. Respondent had sent a $15,000 bill for services to be rendered in connection with both this second parole proceeding and the underlying criminal action. Even though this bill had not been paid in this instance, respondent had considered himself retained and had rendered legal services on the client's behalf in the criminal matter through at least November 10, 1987.

The client testified that respondent had been representing him for seven years, whenever he needed legal assistance— sometimes without a fee. The record shows that the respondent never told the client that their attorney/client relationship had terminated.

After the preliminary hearing on the second parole violation, no one from respondent's office appeared at the final hearing on May 11, 1987. Nor did respondent send anyone to the rescheduled final hearings, which were repeatedly adjourned through December 1987, although respondent's employee had on each instance notified him of their pendency. Respondent claimed that he was never retained and therefore had no obligation to appear. Respondent's assertion is contra-

dicted in the record. Further, since respondent received a series of communications from the Division of Parole advising him of each adjourned date of the final parole hearing, it had to be obvious to him that the Parole Division believed that he was still representing this client. Despite that fact, respondent never advised the Parole Division that it was in error.

As a result of respondent's actions he was charged with aiding a lawyer in the unauthorized practice of law by directing a nonlawyer in his employ to represent a client at a number of parole revocation hearings (Charge 35); neglect in failing to appear, on several occasions, at some of those parole revocation hearings (Charge 36); improperly withdrawing from a case (Charge 37); intentionally failing to carry out a contract of employment (Charge 38); and engaging in conduct adversely reflecting on his fitness to practice law (Charge 39). The Hearing Panel sustained all five charges.

Charges 40 through 43 stem from respondent's representation of a defendant in a criminal proceeding for bank robbery. Respondent was retained by the defendant's mother and stated to her that his fee would be $10,000 payable immediately, and that there might be an additional fee of between $2,000 and $5,000. The $10,000 was promptly paid to respondent, as was a $100 consultation fee. There was no written retainer agreement.

Thereafter, on or about January 22, 1988, respondent sent the client a bill reflecting that this total fee was now $50,000, with the balance to be paid in $5,000 monthly installments. This change in fee had never been discussed with the client or her son. At the time respondent knew that the client's weekly salary was only $400, that her husband was a retired New York City police officer, and that she had borrowed the $10,000 previously paid to him. Respondent claimed that this new fee was justified by his recent discovery that the defendant had committed five robberies. In fact, the defendant had not been charged with these additional crimes and, as it subsequently appeared, could not be connected with any of them. The prosecutor's preindictment letter dated January 11, 1988, on which respondent purportedly relied to increase his fee by $40,000, did not actually assert that defendant committed these other robberies. Further, respondent sent his new bill without ever contacting the prosecutor or undertaking any investigation to determine the veracity of the prosecutor's perceived assertion. The accusatory instrument (a Nassau County District Court information seen by respondent) in-

volved only a single robbery. Further, this defendant had only confessed to this one robbery, and at the bail application hearing, the District Attorney's office never claimed that respondent's client was involved in more than one robbery.

When the client protested, respondent withdrew the proffered new arrangement and stated that she only had to pay an additional $2,000 at that time. Within days, however, the defendant's mother received a modified bill, dated January 29, 1988, which still stated that respondent's fee was $50,000, but which reduced the monthly payments from $5,000 to $2,000. Relying on her latest conversation with respondent, rather than on the contents of what she assumed was an erroneous bill the client sent respondent the additional $2,000 on February 26.

Thereafter, between December 11, 1987 and March 1988, the respondent adjourned seven preindictment conferences without any substantive discussions with the prosecutor or the court. In most instances, respondent did not appear personally but sent a newly admitted associate who had no familiarity with the case. Although he did appear twice, respondent did no more than seek an adjournment on one occasion and, on the second, make a brief oral bail application.

On or about March 21, 1988, respondent was advised that he was being replaced in the matter. On May 20, the client requested that respondent refund the $12,100 fee which she had previously paid and respondent refused to do so claiming that he had earned the entire fee. As a result, he was sued for the fee. On March 12, 1990, a $13,142.50 default judgment was obtained against respondent for his nonappearance at trial. A motion to vacate the default was denied. Respondent thereafter made no attempt to reduce or satisfy that judgment, despite having notice of its entry, until February 1992, well after this disciplinary proceeding had been commenced. In early 1991, a marshal's levy on respondent's checking account resulted in receipt of $1,269.30. Respondent claims that while he did not take any affirmative steps to satisfy the judgment, he never concealed assets and continuously maintained the same checking account the marshal levied upon and deposited funds into it from time to time. Respondent contended that the failure of the judgment to be satisfied was the result of the client's attorney failing to follow up with the marshal on the garnishment of this checking account. The judgment was finally satisfied, pursuant to stipulation in July 1992.

As a result of respondent's actions he was charged with dishonesty, deceit or misrepresentation by unilaterally modifying a fee arrangement (Charge 40); improperly failing to return unearned portions of a fee paid on account (Charge 41); engaging in conduct prejudicial to the administration of justice in failing to satisfy a judgment obtained against him by the dissatisfied client (Charge 42); and engaging in conduct adversely reflecting on his fitness to practice law (Charge 43). The Hearing Panel sustained all four charges.

Charges 44 and 45 involve respondent's retention on October 18, 1988 by a defendant, to replace John Hayden as his trial counsel in a criminal prosecution pending in Orange County, New York. The initial bill rendered to this client reflected a total fee of $25,000, against which two separate $2,000 payments were made. The entire fee was to be paid by November 30, 1988.

As a first order of business, respondent was supposed to appear in court on November 2, 1988, when the case was scheduled for trial. Respondent claimed that he did not learn of this date until October 31, and therefore did not have sufficient time to prepare for trial. Instead, respondent's office informed Mr. Hayden, who was still the attorney of record, that respondent would not be appearing at the hearing since his $10,000 fee had not been paid in full and, therefore, respondent did not consider himself retained. Mr. Hayden was also told that respondent could not appear for the trial since he was otherwise engaged. Respondent asked Mr. Hayden to obtain an adjournment.

No one from respondent's office appeared at the November 2 calendar call. Having been alerted, Mr. Hayden did appear (even though he was being replaced) and sought the adjournment. The application was denied and the trial court directed that a jury be picked immediately. Mr. Hayden did so and then tried the case which lasted two weeks and resulted in this defendant's acquittal on all of the charges against him, except for a single misdemeanor.

After the trial, the defendant asked respondent to handle the posttrial proceedings, including sentencing and appeal. Respondent agreed to do so for an additional $6,000. As noted, only $4,000 of the initial $10,000 retainer had been paid. Before making any additional payment and before respondent rendered any legal services in this regard the defendant told respondent that he could no longer afford his services and

requested a refund of the $4,000 he had previously paid. Thereafter, several discussions ensued about respondent acting as co-counsel with Mr. Hayden. This never came about and Mr. Hayden proceeded alone.

Despite several requests for the refund of the $4,000 retainer fee and an accounting, respondent refused to do either. Respondent claimed that he had numerous conversations with this defendant, reviewed voluminous files and documents and did legal research, all of which justified his retention of the $4,000 fee. The defendant thereupon sued respondent and obtained a default judgment which was not satisfied until 1992, after this disciplinary proceeding had been commenced against respondent, by payment of about $3,000.

As a result of respondent's actions he was charged with improperly failing to return the unearned portion of his fee (Charge 44) and engaging in conduct adversely reflecting on his fitness to practice law (Charge 45). The Hearing Panel sustained both charges.

Charges 46 and 47 relate to respondent's representation of a defendant in a pending criminal prosecution for rape in New York County. The defendant agreed to retain respondent and was informed that the fee would be $15,000. No retainer agreement setting forth the scope of the representation or terms of the fee was ever provided. On or about September 28, 1987, the defendant paid $5,000 against respondent's fee.

Respondent reviewed the court file and, shortly thereafter, advised the defendant that he did not realize that the charges against him involved allegations of rape and attempted rape by two separate complainants and that, as a result, the fee would be increased to $25,000. The defendant advised the respondent that he would retain other counsel. Despite a demand, respondent refused to return the $5,000 and thereafter the defendant agreed not to replace respondent. Respondent claimed that the defendant never demanded the return of the $5,000 but instead offered him "hot" fur coats in exchange for his fee. Respondent rejected that offer.

Respondent appeared in court on the defendant's behalf on September 29, 1987 but the matter was adjourned to November 2, 1987, at respondent's request. On the adjourned date, a nonlawyer from respondent's office appeared and requested another adjournment. The case had been marked ready for trial so that, although the adjournment was granted, respondent was directed to proceed to trial on the December 8, 1987 adjourned date.

Respondent thereafter moved to withdraw because of conflicts with the defendant. The motion to withdraw was returnable on the scheduled trial date. While respondent had previously been advised that replacement counsel was retained and that the motion to withdraw was granted, he refused to return any portion of the $5,000. Respondent claimed that he reviewed the court record, prior counsel's files and discussed the charges with the defendant, all of which justified his retention of the $5,000 fee.

As a result of respondent's actions he was charged with improperly failing to return the unearned portion of his $5,000 fee (Charge 46) and in engaging in conduct adversely reflecting on his fitness to practice law (Charge 47). The Hearing Panel sustained both charges.

Charges 48 and 49 involve respondent's retention to challenge the results of a Coast Guard court martial which had found the client guilty of substance abuse four years earlier, in September 1983. In respondent's view, two potential areas of relief existed: an appeal or a new Federal action alleging violation of the client's civil rights. Respondent was paid $5,000 and an associate was assigned the task of determining the legal viability of the possible claims. Approximately six months later, in November 1987, respondent learned that the client had previously exhausted his appellate remedies. Soon thereafter, he discovered that the Statute of Limitations for any civil rights lawsuit had expired in 1986. Over a year later, in September 1988, respondent advised the client that any challenge to the court martial decision was time barred. Respondent refused either to make any adjustment in his fee or to give an accounting for the legal services allegedly rendered.

Initially respondent claimed that the $5,000 was a nonrefundable fee. Later, respondent asserted that the $5,000 was a fixed minimum fee charged to review the case and determine if there were any viable legal claims. Respondent claimed that because he had not been provided with sufficient information at the beginning of his representation, his office was required to have additional meetings with the client and to review a large number of documents before he could determine whether a meritorious remedy existed. However, respondent had previously testified that, at the time of their initial meetings, the client had told him that the court martial proceeding had resulted in a conviction. A review of that

decision and any appellate determination from the appropriate Coast Guard personnel or the United States Attorney would have revealed the absence of any available appellate remedy or any civil rights cause of action.

As a result of respondent's actions he was charged with failing to return the unearned portion of the $5,000 fee (Charge 48) and engaging in conduct adversely reflecting on his fitness to practice law (Charge 49). The Hearing Panel sustained both charges. In short, the Panel stated that they could not accept that it should have cost $5,000 to learn that which should have been evident to respondent after no more than a few hours work.

Charges 50 through 53 relate to respondent's retention by a counselor at the State University of New York, subsequent to that client's commencement of *pro se* civil rights claim with the State Division of Human Rights in February 1986. The client failed to achieve a promotion purportedly due to racial discrimination. Respondent filed a notice of appearance with the State Division of Human Rights (SDHR).

Respondent was thereafter advised by SDHR that the file was available for his inspection. The inspection of the SDHR file is a vital step in the prosecution of any discrimination claim, as much to determine whether any relevant evidence is yet before SDHR, as to discover—as well as to prepare to refute—any adverse evidence. Rather than inspecting the file himself, or sending a trained lawyer to do so, respondent delegated that task to his client. Respondent claimed that he believed that the file only contained the employer's answer and that he had requested the client to duplicate that document for him. In fact, the SDHR file contained other relevant documentation.

Thereafter, a conference was scheduled which was attended by SDHR's investigator, the client and his employer. Counsel were invited to attend. The client requested respondent to attend this conference with him. In addition, the investigator advised respondent that he was expected to attend. The conference would be the only opportunity the client would have for his lawyer to make an oral presentation on his behalf. Counsel for the employer would be making his own presentation at the conference.

Respondent initially assured the client that he would attend as requested, however on the evening before the hearing respondent decided not to appear, allegedly due to a conflict.

Rather than obtaining an adjournment from SDHR or sending another lawyer, respondent allegedly advised the client that there was no need for a lawyer to be present and that he could handle this on his own. Respondent denied this version of the events, claiming that he had told the client that an adjournment could be obtained but that the client desired to proceed on the following day since he had a good relationship with the SDHR investigator.

SDHR thereafter ruled that there was no probable cause to believe that the client had been the subject of discrimination. Following that determination there were apparently several available remedies which could have been pursued. Respondent, however, merely made an informal application before the SDHR to reopen the investigation which was denied. Respondent claimed that the client had agreed not to pursue his other available remedies. This was refuted by the client who produced a letter written by him to respondent on November 2, 1987 in which the client expressed his concern about the absence of an appeal of the decision to the Federal court, stating that he had assumed that such an appeal would have been filed.

As a result of respondent's actions he was charged with neglect (Charge 50); failing to seek the lawful objectives of his client (Charge 51); prejudicing or damaging his client in the course of the professional relationship (Charge 52); and engaging in conduct adversely reflecting on his fitness to practice law (Charge 53). The Hearing Panel sustained all four charges.

Charges 54 through 59 arise out of respondent's retention by a New York City correction officer, to commence an action as a result of an unprovoked assault by the officer's supervisor. Eleven months later, in May 1987, the officer alerted respondent to the possibility that the Statute of Limitations was about to expire. Respondent, rather than pursue a tort action for assault, opted for a civil rights claim. Respondent contended that this election was fully discussed and approved by the client. The client denied this assertion.

While respondent did recommend a workers' compensation attorney to the client who pursued that remedy to conclusion, there was no evidence presented to support respondent's claim that he either believed, or told the client that the compensation claim precluded a direct action for assault against the supervisor. On October 1, 1987—almost 16 months after his

retention—respondent filed a race discrimination complaint against the New York City Department of Correction (but not the supervisor) with the Equal Employment Opportunity Commission (EEOC). On June 29,1989, he commenced a lawsuit in the United States District Court for the Southern District of New York against the officer's employer and the supervisor who had assaulted him. Respondent conceded that he had focused on the appropriate Statutes of Limitations but nonetheless delayed commencing the actions since he thought that the statute was tolled because of the Department of Correction's continuing racial discrimination in rejecting requests to investigate the merits of the client's claim.

In his Federal complaint, respondent misquoted "Mayor's Executive Order 16", averring that this order was violated when the employer improperly permitted the alleged perpetrator to retire before a proper internal investigation had been completed. Respondent conceded that he did not read the pleading as carefully as he should have, he had never seen the purported order and instead relied upon a law student and on his client, with respect to the order's alleged contents.

A motion for summary judgment was made by defendant, *inter alia,* because the 42 USC § 1981 civil rights claims and the Title VII cause of action were barred by the three-year Statutes of Limitations; because Executive Order 16 actually had no language dealing in any way with retirement; and, in any event, because there was no factual support for the alleged civil rights violation. The motion was made at District Judge Keenan's direction when, at a status conference, respondent refused to withdraw the complaint.

In opposing defendant's motion, respondent failed to comply with Local Rule 3 (g) which requires the party opposing summary judgment to submit a statement of all material factual matters claimed to be in dispute. Without such a statement, the material facts alleged by the movant are deemed admitted. Respondent conceded his awareness of this rule but blamed the failure to comply on his associate although admitting his own inadequate supervision. Respondent sent his associate to argue the motion, despite knowing that she was not admitted to practice in the Federal court. This associate had not previously worked on the case and had not seen the file until just before leaving for court to participate in the argument, when it was given to her because of respondent's unavailability.

Upon discovering—on his own initiative—that this associate was not authorized to practice law in his court, Judge Keenan allowed her to be admitted pro hac vice for the purposes of the motion. Judge Keenan then noticed the absence of a Rule 3 (g) statement. When the associate conceded that she had never heard of Rule 3 (g), the court directed her to submit an affidavit explaining her office's failure to comply with the court's rules. Judge Keenan also directed that the affidavit contain an *in haec verba* recitation of that portion of Mayor's Executive Order 16 which was referenced in respondent's complaint.

The associate reported the court's directions to respondent. Thereafter, an unsolicited Rule 3 (g) statement was submitted, but the court-directed affidavit was not. In an accompanying letter over respondent's name, respondent conceded that he misquoted Executive Order 16 and stated that the language came from a Department of Correction rule. It was conceded also that the proper defendant was the City of New York and not the Department of Correction and leave to amend the complaint was requested as well. Respondent denied having read or having signed the letter.

Due to the failure to supply the mandated affidavit, respondent's Rule 3 (g) statement was rejected. The court also found that respondent had misquoted the contents of Mayor's Executive Order 16 and that there was no comparable Department of Correction rule, despite respondent's contrary representation. Since the supervisor was not named as a respondent in the EEOC proceeding (which, in any event, was not timely commenced), Judge Keenan also ruled that said supervisor could not be sued in the subsequently commenced Federal action.

On December 13, 1989, summary judgment was granted to the defendants and the action dismissed. Respondent was sanctioned in the sum of $1,000 for failing to make a reasonable inquiry into the basis for his pleading, for making a misrepresentation in that complaint, and for failing to submit the court-directed affidavit. Respondent paid the sanction himself on December 20, 1989. Yet, on December 21, 1989, he sent the client a bill seeking reimbursement for this $1,000 payment listing it as a disbursement.

As a result of respondent's actions he was charged with neglect (Charge 54); intentional prejudice or damage to a client (Charge 55); incompetent handling of a legal matter by

premising a Federal cause of action on a nonexistent Executive Order purportedly issued by the Mayor of New York City (Charge 56); directing an attorney, not admitted in that court, to argue a substantive motion in Federal court (Charge 57); conduct prejudicial to the administration of justice both in connection with the above direction and in connection with respondent demanding, when personally sanctioned for his own wrongdoing, that his client pay the resultant fine (Charges 57, 58); and conduct adversely reflecting on his fitness to practice law (Charge 59). The Hearing Panel sustained each of these charges.

Charges 63 through 65 result from the respondent's retention to defend a client in a lawsuit by her husband's former employer which alleged, in substance, that she was in possession of funds that had been illegally converted from that employer. The husband had pleaded guilty to larceny and was incarcerated. As part of his plea he had executed a confession of judgment. Apparently, the money had been deposited in the couple's joint account and used to fund several businesses in which the client was an employee and, in some, also an officer and shareholder.

At the time respondent was retained, the employer, New York Life Insurance Company, had obtained a temporary restraining order "freezing" the client's assets, which totaled about $7,000, until the argument of New York Life's preliminary injunction motion. Respondent appeared in the action and obtained a stipulation extending his client's time to respond to the complaint until September 21, 1990. The preliminary injunction motion was itself adjourned on several occasions, ultimately until November 14, 1990. Respondent, however, never sought to extend the client's time to answer beyond September 21.

On September 26, an associate assigned to the matter advised respondent that the client was in default and yet, respondent did not seek to cure his client's failure to plead. The client testified that she never agreed that an answer should not be served when due. Thereafter, respondent did not appear on the return date of the preliminary injunction motion, claiming that he was otherwise engaged. Respondent also failed to submit any papers in opposition to that November 14 motion.

On or about November 19, 1990, New York Life moved for an order directing entry of a default judgment against the

client for her failure to plead. Respondent filed opposition to that motion, but still had not submitted a responsive pleading. Moreover, in his papers, respondent actually consented to an inquest hearing to fix New York Life's damages against his client for her default in not answering the complaint. The court directed the entry of the default judgment and that an inquest be held to determine the amount of New York Life's damages. The court also dismissed the preliminary injunction motion as moot and granted New York Life a permanent injunction, noting in the order that, although respondent's client had secured stipulations extending her time to oppose the motion, she had defaulted there also.[2]

An evidentiary inquest hearing was held on September 26-27, 1991. Respondent sent an associate in his office, who had not previously worked on the matter, to act as counsel. Prior to the hearing, the associate sought to discuss with the client the fact that a default had been entered against her for her failure to answer the complaint. However, the client stated that she had no prior knowledge of the default. A judgment was thereafter entered against the client in the sum of $671,070.72. Thereafter, the client retained new counsel who succeeded in vacating the judgment by demonstrating respondent's neglect and unauthorized conduct, as well as the existence of a meritorious cause of action.

Respondent claimed that if the client had not defaulted, her testimony would have subjected her to criminal exposure. Respondent contended that he found his client to be incredible at her deposition, based on his subsequent conversation with the associate and his review of her notes. According to respondent, the client could not explain the source of significant assets. Thus, respondent claimed that he advised the client to default in the civil case in order to avoid criminal prosecution concerning the source of the assets. Respondent, however, could not explain how a civil judgment against his client would prevent future criminal prosecution.

---

2. Respondent's file contains an answer to the New York Life complaint which was verified by the client and both signed and notarized by respondent on December 31, 1990, weeks after the return date of the motion for a default. This pleading denied the substantive allegations of the complaint and asserted five affirmative defenses. Respondent failed to explain why this answer was prepared and signed at that late date. It is clear, however, that if the client had actually consented to the entry of a default judgment against her, there would have been no need for her to verify this pleading or even for the pleading to be prepared by respondent's office.

We note that the client's deposition, by New York Life, in the civil case began on September 24, 1990, three days after her answer was due. The examination was not concluded on that day and, in fact, was never completed. Respondent sent an associate who had been admitted to practice for only two months, and who was without any experience either in the criminal law or in defending depositions. Moreover, respondent concededly never instructed this associate on the proper application of the client's Fifth Amendment privilege. Although the associate did advise the client to assert this privilege in response to a few of the deposition questions, she told the Panel that she was unaware that respondent had any concerns about the client's possible criminal exposure.

As a result of respondent's actions he was charged with neglect (Charge 63); intentionally failing to seek the lawful objectives of his client when he agreed to allow an inquest hearing to proceed against his client without first obtaining her consent (Charge 64); and engaging in conduct adversely reflecting on his fitness to practice law (Charge 65). Based upon the evidence presented the Hearing Panel sustained each of these charges. In short, the Panel concluded that there seems to have been no legitimate legal stratagem which would have justified respondent's tactics.

Charges 66 through 68 involve respondent's representation of a client in a racial discrimination case in the Federal District Court. An associate in respondent's office was assigned to the matter. Although admitted to the New York State Bar in 1984, this associate had not been admitted to practice in the Federal courts, as respondent undisputedly knew, during her employment with him from December 1990 through October 1991, when she was terminated.

The associate had represented the client at several deposition sessions and prepared the opposition papers when the defendant moved for summary judgment. The associate told respondent that she did not think she would be able to argue the motion since she was not admitted to practice in the Federal court. Respondent directed her to do so. The associate argued the motion without advising the court of her status. Furthermore, this associate testified that if she refused the assignment, she thought she would be fired and that she was not aware that she could be admitted to the court pro hac vice.

Respondent claimed that he did not direct the associate to

argue the motion but instructed her to advise the court of her status and to request admission pro hac vice. Respondent, however, concededly made no alternative plans in the event that the court denied the application.

The transcript of the March 21, 1991 argument before District Court Judge Patterson disclosed that the associate never advised the court that she was not authorized to practice law in his court. Rather, she briefly argued in opposition to the summary judgment motion, after which the court, on the record, granted the motion.

As a result of respondent's actions he was charged with directing a lawyer to appear in substantive matters in the Federal District Court when he knew that she was not admitted to practice in that forum (Charge 66); engaging in conduct both prejudicial to the administration of justice (Charge 67) and adversely reflecting on his fitness to practice law (Charge 68). During the hearing, the DDC was permitted to add another charge accusing respondent of improperly supervising the unadmitted associate. The Hearing Panel sustained all four charges.

Charges 69 through 72 relate principally to the work of a legal secretary/paraprofessional in respondent's office from March 1991 until October of 1991, and her work on two matters.

During the summer of 1991, this individual drafted the pleadings in two matters. During this time, respondent was actively involved running for the New York City Council. The secretary asserted that respondent made her a paraprofessional to ease his own workload, which was already increased due to his involvement in politics. She had no prior experience in legal draftsmanship except for a *pro se* complaint which she had prepared in her personal lawsuit against an automobile mechanic. This person prepared complaints in the two matters, which were replete with grammatical, typographical and substantive errors. For example, one action was a medical malpractice, wrongful death action. Although the decedent's daughter had been appointed to administer the estate, the caption of the action provided that the daughter was suing in her own name and not on behalf of the estate. The individual defendants were each defined as licensed physicians "duly existing under the laws of the State of New York."

In the second action while respondent remembered telling his secretary to commence the action in Federal court, the

initial pleading bore a State court caption and asserted a State law cause of action. The pleading itself purports to quote from the headnotes following 42 USC § 423, contains numerous irrelevant fact assertions, confuses allegations of negligence with claimed civil rights causes of action and seeks relief (including class action relief) not justified by any of the pleaded allegations.

The secretary testified that she drafted these complaints at respondent's specific direction, and that she was given no outline to follow or instructions as to what to do. The exhibits in the medical malpractice complaint (19 separate hospital reports and letters) were added without any input from respondent. On separate occasions she presented the two typed pleadings to respondent, which he signed without comment, review or change.

Respondent, however, testified that he edited these complaints after careful review. According to respondent, the fact that these pleadings contain errors does not mean that he did not review them or failed to supervise their preparation.

Charges 69 and 71 alleged that respondent aided in the unauthorized practice of law; while Charges 70 and 72 asserted that respondent engaged in conduct adversely reflecting on his fitness to practice law. Based upon the evidence presented, particularly a review of the two complaints, the Hearing Panel sustained each of the charges.

Charge 73 asserts that all of the prior charges against respondent demonstrate a pattern of conduct which adversely reflects on his fitness to practice law. The Hearing Panel sustained this charge.

As set forth above, the Hearing Panel sustained 66 of the 71 charges against respondent. Respondent failed to appear at the scheduled hearing on sanction. His counsel, while disagreeing with the staff's recommendation of disbarment, offered no counterproposal despite the Panel Chair's invitation that he do so. Respondent's counsel stressed respondent's positive community contributions and suggested that the Panel's findings were not as serious as staff claimed they were. The Panel also accepted into evidence letters written on behalf of respondent from prominent members of the community.

The Hearing Panel in a 102-page report, stated:

"respondent's testimony was frequently beyond logic, at times blatantly incredible, and, on balance, clearly not helpful

to his cause. Not only was respondent's trial testimony often internally inconsistent but, many times, it was readily contradicted by his own earlier deposition testimony or by documents prepared by him contemporaneously with the events in issue. * * *

"This Report cites several dozen instances where respondent either forgot or ignored his non-delegable responsibilities to clients. We are not here faced with sporadic slips by a busy practitioner but a well-demonstrated pattern of serious professional lapses which undercut the most basic principles of our profession."

By petition dated October 19, 1994, the Departmental Disciplinary Committee is now seeking an order confirming the Hearing Panel's findings of fact and conclusions of law and imposing a sanction that is just and equitable in the circumstances. By cross motion dated November 22, 1994 the respondent sought an order transferring this matter to either the Third or Fourth Judicial Department for a de novo hearing with respect to the many charges sustained by this Department's Panel. We have already denied respondent that relief in an earlier order. In the alternative, respondent seeks an order disaffirming the Hearing Panel's report and dismissing the proceeding. This we decline to do.

A review of the evidence presented to the Hearing Panel indicates that there is ample support for the Hearing Panel's findings that respondent is guilty of 66 instances of professional misconduct involving 20 different clients. Respondent's misconduct includes repeated neglect of client matters, many of which concerned criminal cases where a client's liberty was at stake; misrepresentations to clients; refusal to refund the unearned portion of fees; and multiple instances in which respondent improperly facilitated the practice of law by an otherwise unqualified layperson or unadmitted attorney.

Respondent's claim that insufficient evidence was presented to support the Hearing Panel's findings is merely a rehash of the defenses he raised to the charges during the hearings before the Panel. These defenses were considered by the Hearing Panel and properly rejected due to the fact that respondent's testimony was inconsistent, unpersuasive and incredible. Respondent failed to produce any documentation to support his position and in most instances the documentation, which was otherwise produced, contradicted respondent's version of what had taken place.

In determining appropriate sanctions in lawyer disciplinary cases, this Court has traditionally weighed mitigating and aggravating circumstances which might bear upon a lawyer's misconduct. However, in respondent's case, the mitigating factors if any, are far outweighed by the proven charges of misconduct and the substantial aggravating factors present herein.

Respondent has been found to have engaged in a pattern of professional misconduct that has spanned at least six years. The violations are ongoing and of a serious nature. The many aggravating factors include: (1) the very large number of Code violations the Panel found involving 20 different clients; (2) the fact that in at least three of these cases misconduct continued after the original charges had been filed; (3) the serious nature of many of the violations and; (4) respondent's indifference to making restitution. We take special note of the fact that virtually all of the clients who appeared as complainants in this proceeding were low or moderate income persons who had retained the respondent because of his reputation in the community as a representative of the disadvantaged. The ongoing pattern of serious misconduct and the substantial aggravating factors present require that respondent not be permitted to continue to practice law.

Therefore, in view of the said pattern of serious professional misconduct, we conclude that the sanction of disbarment is warranted *(see, Matter of Siskin, 95 AD2d 1).*

Accordingly, the respondent's cross motion insofar as it seeks an order disaffirming the Hearing Panel's report and dismissing this proceeding is denied in its entirety; the Committee's petition is granted to the extent of confirming the Hearing Panel's findings of fact and conclusions of law and the respondent is disbarred with his name to be stricken from the roll of attorneys forthwith.

ELLERIN, J. P., WALLACH, RUBIN, ROSS and TOM, JJ., concur.

Cross motion, insofar as it seeks to disaffirm the Hearing Panel's report and dismiss this proceeding, denied in its entirety, and the Departmental Disciplinary Committee's petition is granted only to the extent of confirming the Hearing Panel's findings of fact and conclusions of law, and respondent is disbarred from practice as an attorney and counselor-at-law in the State of New York, effective forthwith.